**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Eastern Division)**

| | |
|---|---|
| INTENT PERFORMANCE LLC,<br><br>　　　　　*Plaintiff*,<br>　　v.<br><br>INTENT SPORTS & FITNESS, LLC,<br>MARCUS MOORE, BRIAR RUSSELL,<br>ADAM BASSETT, AND KATIE BETH<br>SUMRALL,<br><br>　　　　　*Defendants*. | Case No. ___2:23-cv-86-TBM-RPM___<br><br><br>**JURY TRIAL<br>DEMANDED** |

## COMPLAINT

Plaintiff Intent Performance LLC ("Performance" or "Plaintiff"), through counsel, hereby files it complaint against Defendants Intent Sports & Fitness LLC ("Sports & Fitness"), Marcus Moore, Briar Russell, Adam Bassett, and Katie Beth Sumrall (together with Sports & Fitness, the "Defendants").  In support thereof, Performance alleges as follows:

### NATURE OF THE CLAIMS

1.　　Performance is in the business of providing batting and pitching lessons to baseball players through the application of integrated analytics and technology developed through the expertise of its principal, David Parkinson.

2.　　Mr. Parkinson formerly played baseball at the University of Mississippi and currently plays baseball professionally.  An accomplished player and student of the game, Mr. Parkinson developed unique formulae to train baseball players of all levels to improve their game.

3.      Performance and two of its members, Mr. Parkinson and his wife, Bailey, historically had business relationships with Sports & Fitness and Messrs. Moore, Russell, and Bassett.

4.      Until late May 2023, Mr. and Mrs. Parkinson were members of Sports & Fitness, and Mr. Bassett was an employee of Performance.

5.      Things changed abruptly when Mr. Russell—then a member of both Performance and Sports & Fitness—induced Mr. and Mrs. Parkinson to permit Sports & Fitness to redeem their shares in exchange for his relinquishing his shares in Performance.  According to Russell, this would enable Sports & Fitness to focus exclusively on operating its gym and Performance to focus exclusively on operating its baseball coaching and analytics programs.

6.      In reality, Mr. Russell's professed motivations were intentionally misleading and part-and-parcel of a concerted scheme hatched and carried out by Defendants to eject Performance from its facility, steal its trade secrets, appropriate its business as their own, and destroy Performance as a going concern.

7.      Defendants had been planning this scheme for weeks or months and, as soon as Mr. and Mrs. Parkinson surrendered their shares in Sports & Fitness, Defendants engaged in a series of wrongful and malicious actions to carry out their plan.

8.      For instance, immediately after Mr. and Mr. Parkinson relinquished their shares in Sports & Fitness, Defendants: (i) contacted Performance's clients and wrongfully told them to remit payment to Sports & Fitness; (ii) wrongfully accessed, without authorization, Performance's computers and related devices and stole Performance's trade secrets; (iii) wiped the hard drives of Performance's computers and related devices, destroying their customer lists and other commercially competitive information, including marketing material, needed to run its

business; (iv) wrongfully denied Performance access to its facility and intentionally destroyed Performance's property; (v) appropriated Performance's property for their own commercial use; and (vi) other wrongful acts as alleged in greater detail below.

9.     Through its Complaint, Performance seeks recompense for these wrongful acts, which Defendants carried out in concert with malicious intent, and which has predictably and foreseeably caused the ruin of its business.  As set forth below, Defendants are liable to Performance for an amount greater than $1,800,000.

## PARTIES

10.     Plaintiff Intent Performance LLC is a limited liability company organized under the laws of Mississippi with its principal place of business at 202 West Spruce, Ellisville, Mississippi 39479.  Its members are David Parkinson, a citizen of Virginia; and Chase Stewart, a citizen of Mississippi.

11.     Defendant Intent Sports & Fitness LLC is a limited liability company organized under the laws of Mississippi with its principal place of business at 204 West Pine, Ellisville, Mississippi 39437.  It may be served with process through its registered agent, Marcus Moore, at 14 Bulldog Lane, Ellisville, Mississippi 39437 or wherever he may be found.  Its members are Marcus Moore, a citizen of Mississippi; and Briar Russell, a citizen of Mississippi.

12.     Defendant Marcus Moore is an adult resident and citizen of Mississippi.  He may be served with process at 14 Bulldog Lane, Ellisville, Mississippi 39437 or wherever he may be found.

13.     Defendant Briar Russell is an adult resident and citizen of Mississippi.  He may be served with process at 14 West Spruce, Sumrall, Mississippi 39482 or wherever he may be found.

14.      Defendant Adam Bassett is an adult resident and citizen of Mississippi.  He may be served with process at 204 West Pine, Ellisville, Mississippi 39437 or wherever he may be found.  Mr. Bassett is an employee of Sports & Fitness.

15.      Defendant Katie Beth Sumrall is an adult resident and citizen of Mississippi.  She may be served with process at 204 West Pine, Ellisville, Mississippi 39437 or wherever she may be found.  Ms. Sumrall is an employee of Sports & Fitness.

## JURISDICTION AND VENUE

16.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves federal questions, to wit:  Performance asserts claims against Defendants under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims because they arise from the same nucleus of operative fact as the federal claims.

17.      This Court has personal jurisdiction over Defendants because they are all citizens of the State of Mississippi.

18.      Venue is proper in this district under 28 U.S.C. § 1391 because events, acts, or omissions giving rise to Performance's claims occurred in the Southern District of Mississippi and because Defendants reside in this judicial district.

## GENERAL ALLEGATIONS

### a.  Intent Performance LLC and Intent Sports & Fitness LLC

19.      Mr. Parkinson played baseball at the University of Mississippi and currently plays professionally for a minor league team associated with the Philadelphia Phillies franchise.  He is a life-long student of the game, and he has acquired skills and expertise through dedicated study to provide high quality coaching services to players of all levels.

20.    It is against that backdrop that Mr. Parkinson decided to organize Performance, which is in the business of providing baseball coaching.  Among other things, Mr. Parkinson has developed training plans, drills, and other coaching techniques that integrate technology and analytics.

21.    In or around 2020, Mr. Parkinson organized Performance.  Briar Russell became a member of Performance.

22.    Thereafter, Mr. Parkinson and Mr. Russell started Sports & Fitness.  Mr. Parkinson and his wife, Bailey, were members of Sports & Fitness.

23.    Although Performance and Sports & Fitness shared "Intent" as part of their names and marks, their functions were very different:  Performance focused on baseball coaching; and Sports & Fitness was a gym.  There were synergies between the two businesses.

24.    In 2022, Performance and Sports & Fitness needed physical space to accommodate their distinct businesses operations.

25.    They located a large building in Ellisville owned by Mace Realty.  Marcus Moore is a principal of Mace Realty and controls its operations.  At that time, Mr. and Mrs. Parkinson were also members of Mace Realty.

26.    The building was divided into two distinct parts.  On one side, Sports & Fitness operated a weightlifting and gym facility.  On the other side, Performance operated indoor batting cages, pitching cages, and administered its baseball coaching services with proprietary training plans Mr. Parkinson created.

27.    Operations worked for a time, and the two businesses—although distinct—developed synergies and had overlapping personnel.  For example, Mr. Russell's wife performed accounting and bookkeeping functions for both Performance and Sports & Fitness.  Mr. Russell

split his time performing functions for both Performance and Sports & Fitness.  And Mr. Moore—the principal of Mace Realty and a member of Sports & Fitness—rented the space to both companies and served as their landlord.

28.    Mr. Parkinson had other duties, however, and all involved knew this.  In Spring 2023, Mr. Parkinson and his wife, Bailey, traveled to Clearwater, Florida for Spring Training. This obviously was a well-known, essential part of his job as a professional baseball player, but it also enabled Mr. Parkinson to develop and refine coaching techniques and make important business and marketing contacts for Performance.  Sports & Fitness—which was located in the same building—enjoyed ancillary benefits from Performance's business.  Again, the businesses had synergies: naturally, a baseball player could expect to improve technique and form through Performance, and to improve fitness through Sports & Fitness.

29.    Although Mr. and Mrs. Parkinson's travel plans were well known and arrangements had been made for Mr. Russell and Mr. Bassett to manage Performance in their three-month absence, the Parkinsons noticed unusual and worrisome changes in their partners' attitudes and demeanor.

30.    For instance, calls to Mr. Russell, Mr. Bassett, and Mr. Moore's wife went unreturned.  Mrs. Parkinson, who taught fitness classes and created fitness programs for Sports & Fitness, was denied access to the platform used to track class attendance.  This prevented Mrs. Parkinson from determining which classes were successful and which were not.  It also prevented her from analyzing and assessing revenues and other aspects of Sports & Fitness business performance.

31.    When Mr. and Mrs. Parkinson returned to Ellisville from Spring Training, it had become apparent that, during their absence, Mr. Russell, Mr. Bassett, and Mr. Moore – with help

and input from others – had decided the overlapping membership interests in Performance and Sports & Fitness, and the businesses themselves, should be divorced.

### b. Briar Russell Fraudulently Induced David and Bailey Parkinson to Sell Their Shares in Intent Sports & Fitness

32.     In April 2023, Mr. Russell and Mr. Moore presented Mr. and Mrs. Parkinson with a proposal: Mr. Russell would relinquish his ownership in Performance in exchange for Mr. and Mrs. Parkinson relinquishing their ownership interests in Sports & Fitness and Mace Realty. Under this agreement, Sports & Fitness and Mace Realty each would execute a $20,000 promissory note (a total of $40,000) in favor of Mr. and Mrs. Parkinson.

33.     According to Mr. Russell, this proposal was mutually beneficial.  Mr. Russell told Mr. Parkinson this division was necessary so Mr. Russell could focus exclusively on the gym operations at Sports & Fitness, and Mr. Parkinson could focus exclusively on the coaching operations at Performance.

34.     For example, on April 10, 2023, Mr. Russell texted Mr. Parkinson:  "if you want out of the gym to focus on playing and performance, I will trade you my %12.5 of performance and 10k for your ownership of [Sports & Fitness] and Mace.  Then I can focus on the gym…."

35.     Two days later, Mr. Russell followed up on his proposal:  "have you given anymore thought about me and you swapping ownership for [P]erformance and gym/[M]ace?"

36.     Mr. and Mrs. Parkinson relied on Mr. Russell's representation that the purpose of this proposal was to allow each to focus their efforts only on Performance and Sports & Fitness, respectively.

37.     Had Mr. and Mrs. Parkinson known that Mr. Russell, with help from Mr. Bassett (a Performance employee), Mr. Moore, and Katie Beth Sumrall (a Sports & Fitness employee), intended to carry on with baseball coaching operations and destroy Performance, they would

never have agreed to the deal. That would have placed Performance at a tremendous competitive disadvantage, and, in any event, Mr. Russell represented to them that Sports & Fitness would not intrude on Performance's professional space and market.

38.    On May 17, 2023, Mr. and Mrs. Parkinson executed an Agreement of Redemption and Assignment of Membership Interest of Mace Real Estate Holdings, LLC and an Agreement of Redemption and Assignment of Membership Interest of Intent Sports & Fitness LLC.

39.    Each document at Paragraph 8 contained an identical provision:

Each party agrees that, following this Agreement and Assignment, no party will make any public statement which materially disparages any of the other parties, their businesses, or the officers, employers, or agents of those businesses.

40.    Moreover, each of those agreements contained the implied covenant of good faith and fair dealing.

41.    Within days of Mr. and Mrs. Parkinson's signing these agreements, Defendants carried out a scheme to destroy Performance that obviously had been planned and in place for weeks, if not months.

###    c.    Defendants Conspired to Tortiously Interfere With and Destroy Intent Performance LLC's Business and Contracts

42.    Mr. Bassett, then a Performance employee, submitted his resignation and immediately became employed by Sports & Fitness.

43.    Among other things, Mr. Bassett contacted Performance's clients and falsely told them their accounts were now being handled by Sports & Fitness, not by Performance. This false representation disparaged Performance in violation of Paragraph 8 of the foregoing agreements, and it was made at the direction and for the benefit of Sports & Fitness, Mr. Moore, and Mr. Russell.

44.     In addition, Mr. Bassett directed Performance's clients to make payments to Sports & Fitness for services Performance had performed.

45.     Separately, Sports & Fitness – at Mr. Russell's direction and in direct contravention to the representations he made to Mr. and Mrs. Parkinson to induce them to relinquish ownership in Sports & Fitness – began advertising baseball coaching lessons.

46.     Again, Sports & Fitness had never provided baseball coaching services and Mr. Russell assured Mr. and Mrs. Parkinson it would not provide such services; it would continue to operate as a gym and only as gym.

47.     Nevertheless, on May 24, 2023, Sports & Fitness advertised on Instagram a "Youth Agility Baseball Camp" from June 20 to 22, 2023 for ages 5 to 14.  This directly interfered with Performance's business and materially disparaged Performance's business by causing clients (and prospective clients) to reasonably—but incorrectly—believe that Sports & Fitness assumed Performance's business.  It also confirmed Mr. Russell's fraudulent inducement and was a flagrant breach of the covenant of good faith and fair dealing, approved by and benefiting Mr. Moore.

48.     In addition, Sports & Fitness' website held Mr. Bassett out as the "Director of Baseball" – a function that had never before existed at Sports & Fitness, as it fell within Performance's exclusive purview.

49.     Mr. Russell was also booking and arranging private coaching lessons.  In late May 2023, a client carrying baseball equipment entered the building Performance and Sports & Fitness shared.  He approached the Performance side—where coaching lessons were performed—and stated he was there for his coaching session with Mr. Russell.

50.    Together, these acts establish that Sports & Fitness, Mr. Russell, Mr. Bassett, and Mr. Moore intended to assume Performance's business and destroy it as a going concern once Mr. and Mrs. Parkinson could be convinced to relinquish their ownership interests in Sports & Fitness and Mace Real Estate.

### d. Defendants Wrongfully Accessed Intent Performance LLC's Computers and Stole Its Trade Secrets

51.    During the same time, Mr. Bassett accessed Performance's desktop computer without authorization.  From there, he created screenshots of Performance's programming and coaching regimens, which Mr. Parkinson had created and refined through years of studied practice.

52.    There was no question these programming and coaching regimens were Performance's proprietary and confidential information.  They were unique and no entity other than Performance was using them.

53.    On May 22, 2023, Mr. Bassett emailed these screenshots to his fiancé, Karlee Green (kgreen4860@jcjc.edu).

54.    Later, on May 31, 2023, Mr. Bassett emailed additional programming and coaching regimens (velocity drill work) to Mr. Russell (briar.russell1234@gmail.com), Mr. Moore (marcusdmoore84@gmail.com), and Mr. Moore's wife, Ashley (abarlow82@yahoo.com).

55.    Mr. Bassett had no authority to disseminate this proprietary and confidential information outside of Performance, and he knew that.  At the time Mr. Bassett accessed and sent that information to unauthorized recipients on May 22, he already had planned to leave Performance and join Sports & Fitness.  At the time Mr. Bassett accessed and sent information to unauthorized recipients on May 31, he had already left Performance's employment.

56.     Moreover, Mr. Bassett's unauthorized access to and sending this information, and Messrs. Russell's and Moore's receipt of it, is further evidence confirming they acted in concert to steal Performance's trade secrets, its business, and destroy it as a going concern.

57.     Ms. Sumrall was also integral to this plan.  Performance discovered a notepad on one of its desks that contained notes obviously written by Ms. Sumrall.  These notes detailed Defendants' plan to take over Performance's business and destroy what Mr. and Mrs. Parkinson had worked so hard for years to build.

> **e.  Marcus Moore Caused Mace Real Estate Holdings, LLC, in Concert With Others, to Wrongfully Deny Intent Performance LLC Access to Its Facility**

58.     During this time, Mr. Russell's wife continued to act as Performance's accountant and bookkeeper.  She had access to Performance's finances and, through her course of performance and course of dealing with Performance, advised Performance about account balances and payables as they were coming due.  If, for example, Performance's rent on the building owned by Mace Real Estate was coming due and Performance may not have had sufficient funds to cover the payment, she would alert Performance so arrangements for timely payment could be made.

59.     In May 2023, however, Mr. Russell's wife remained silent as the rent came due but Performance lacked sufficient funds to cover it.

60.     Performance promptly realized it would be late with the payment (the first time it had ever been late on rent), and it informed Mace Real Estate and Mr. Moore of that fact. Performance was assured that late rent would not be problematic, and Performance did, in fact, make the rent payment.

61.     Then, unexpectedly and without warning, Mace Real Estate—through Mr. Moore—caused Performance to be served with a Notice to Quit on May 30, 2023, less than two

weeks after Mr. and Mrs. Parkinson relinquished their ownership interests in Sports & Fitness and Mace Real Estate and during the same time Defendants were stealing Performance's trade secrets, advertising baseball coaching lessons and camps, and engaging in other wrongful conduct to destroy Performance.  Mr. Moore signed the Notice to Quit.

62.     According to the Notice to Quit, Performance was given 30 days—until June 30, 2023—to vacate the building.  The reasons stated were "failure to pay rent in a timely manner, conflict of interest for other tenants, no lease."

63.     These reasons were false.  Defendants created the conditions for a single late payment of rent and, further, assured Performance that late payment was not problematic.  Mr. Moore, using Mace Real Estate, then reneged on that assurance and used that as justification to eject Performance.  The other reasons, "conflict of interest" and "no lease" were outright falsehoods or not justifiable (a "conflict of interest" was not a valid reason under Performance's lease to eject it and, in any event, if a "conflict of interest" was created, it was created by Defendants).

64.     Despite being given 30 days to vacate, Mr. Moore and Mr. Russell nevertheless denied Performance access to the building thereafter—including during ordinary business hours. Their intentional denial of access not only prevented Performance from claiming its property and carrying out business operations for June 2023 (which it was entitled to do), but it also gave Sports & Fitness, Mr. Bassett, Mr. Moore, and Mr. Russell the opportunity to ruthlessly damage other Performance property.

### f.   Defendants Destroyed Intent Performance LLC's Property

65.     After Mr. Moore caused the locks to be changed on the building, Mr. Bassett entered Performance's office space and retrieved a laptop, iPad, and cell phone owned and used by Performance.

66.     Mr. Bassett, in concert with Mr. Russell and Mr. Moore, caused the hard drives on these devices to be wiped.

67.     This action caused the destruction of Performance's client contact lists, its marketing materials, and other confidential and proprietary information it (and it alone) owned, which was essential to the operation of its business.  Although the devices have been retrieved, the data and information has been destroyed and lost forever (the laptop's hard drive has been destroyed, and it will require a new one).

68.     Further, a Sports & Fitness employee entered Performance's side of the building, picked up a baseball bat that belonged to Performance, and began throwing it around the room. This action was captured by Performance's video surveillance.  The next day, the bat was found broken in half.

69.     A Sports & Fitness tampered with a radar gun owned by Performance and destroyed the extension cord used to operate it.  The next day, Performance could not use the radar gun for a scheduled coaching session.

70.     Other acts of vandalism and destruction have occurred.  A desk and filing cabinet owned by Performance have been badly damaged and defaced.

71.     Upon information and belief, and in light of the foregoing wrongful conduct, these actions were sanctioned by, carried out by, or directed by Mr. Russell, Mr. Moore, and/or Mr. Bassett.

## COUNT ONE

**Theft of Trade Secrets**
**Defend Trade Secrets Act**
**28 U.S.C. § 1836**

**(Adam Bassett)**

72.     Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

73.     Performance created processes, documents, and proprietary information used in the performance of providing unique coaching services informed by technology and analytics.

74.     Mr. Bassett accessed a computer owned by Performance to steal and misappropriate Performance's trade secrets, including, but not limited to its programming, velocity drills, and related information.

75.     Mr. Bassett's acquisition, dissemination, and misappropriation of Performance's proprietary information and/or materials is unlawful as such information and material constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

76.     Mr. Bassett's use of this information is improper and constitutes misappropriation of protected property, processes, documents, and or trade secrets owned by Performance.

77.     Performance's trade secrets are related to a product or service used in, or intended for use in, interstate commerce.  Performance's clients do not exclusively reside in Mississippi and Performance's services are marketed, *inter alia*, via the internet and through social media in interstate commerce.

78.     Mr. Bassett's use of this information is further unlawful because he used improper means to acquire the trade secrets and proprietary information in that they were: (a) derived from or through a person who had utilized improper means to acquire them; (b) acquired under

circumstances giving rise to a duty to maintain their secrecy; or (c) derived from or through a person who owed a duty to the person seeking relief to maintain their secrecy.

79.    Mr. Russell's acquisition and misappropriation of Performance's trade secrets was willful, malicious, and in bad faith.

80.    As a result of these legal breaches, Performance's entire business has been damaged and/or destroyed.  Based on historical data and conservative estimates on a going forward basis, Performance will lose as much $25,000 in revenue per month over the next three years, or $900,000.  Performance seeks damages of at least that amount or greater amounts to be proven at trial.

## COUNT TWO

**Unauthorized Computer Access and Theft**
**Computer Fraud and Abuse Act**
**28 U.S.C. § 1030**

**(Adam Bassett)**

81.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

82.    Mr. Bassett exceeded his authorized access, or engaged in unauthorized access, by logging in to Performance's computers, accessing and copying its trade secrets and proprietary information, and intentionally disseminating that information to recipients he knew intended to harm Performance in its business.

83.    The computers Mr. Bassett accessed were connected to the internet, were used to market Performance's business on social media, were used to communicate with clients and other recipients outside the State of Mississippi, and they were used in interstate commerce.

84.    Mr. Bassett's unauthorized access to Performance's computers damaged Performance in an amount greater than $5,000.

## COUNT THREE

**Aiding-and-Abetting or Conspiracy to Commit
Unauthorized Computer Access and Theft
Computer Fraud and Abuse Act
28 U.S.C. § 1030**

**(Sports & Fitness; Marcus Moore; Briar Russell; and Katie Beth Sumrall)**

85.     Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

86.     18 U.S.C. § 1030(b) recognizes conspiracy liability for a violation of CFAA.

87.     18 U.S.C. § 1030(g) creates a private right of action for CFAA conspiracy claims. *See Hovanec v. Miller*, 2018 WL 1221486, at *8 (W.D. Tex. Mar. 7, 2018).

88.     Sports & Fitness, Mr. Moore, Mr. Russell, and Ms. Sumrall formed an illegal agreement, to wit:   to wrongfully acquire and misappropriate Performance's trade secrets acquired through illegal and unauthorized access by Mr. Bassett.

89.     This agreement is evidenced through Ms. Sumrall's handwritten notes, Sports & Fitness' advertising baseball coaching lessons, Mr. Russell's arranging baseball coaching lessons, Mr. Moore's role in wrongfully ejecting Performance and denying it access to its physical space, intentional destruction of Performance's property, including its customer lists and marketing materials, and wrongful communications to Performance's clients to intercept funds owed to Performance.

90.     Each of Sports & Fitness (through its agents), Mr. Moore, Mr. Russell, and Ms. Sumrall committed at least one overt act in furtherance of the conspiracy, and each of them aided-and-abetted Mr. Russell's unauthorized computer access.

91.     Mr. Bassett's unauthorized access to Performance's computers damaged Performance in an amount greater than $5,000.

## COUNT FOUR

**Aiding-And-Abetting or Conspiracy to Commit
Theft of Trade Secrets
28 U.S.C. § 1836**

**(Sports & Fitness; Marcus Moore; Briar Russell; and Katie Beth Sumrall)**

92.     Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

93.     Sports & Fitness, Mr. Moore, Mr. Russell, and Ms. Sumrall aided-and-abetted Mr. Bassett and conspired with Mr. Bassett to violate the Defend Trade Secrets Act as alleged in Count One.

94.     Sports & Fitness, Mr. Moore, Mr. Russell, and Ms. Sumrall formed an illegal agreement, to wit:  to wrongfully acquire and misappropriate Performance's trade secrets acquired through illegal and unauthorized access by Mr. Bassett.

95.     This agreement is evidenced through Ms. Sumrall's handwritten notes, Sports & Fitness' advertising baseball coaching lessons, Mr. Russell's arranging baseball coaching lessons, Mr. Moore's role in wrongfully ejecting Performance and denying it access to its physical space, intentional destruction of Performance's property, including its customer lists and marketing materials, and wrongful communications to Performance's clients to intercept funds owed to Performance.

96.     Each of Sports & Fitness (through its agents), Mr. Moore, Mr. Russell, and Ms. Sumrall committed at least one overt act in furtherance of the conspiracy, and each of them aided-and-abetted Mr. Russell's unauthorized computer access.

97.     Further, Sports & Fitness—through its agents, Mr. Moore, Mr. Russell, Mr. Bassett, and Ms. Sumrall—are using these stolen trade secrets to generate profits that rightfully belong to Performance.

98.    As a result of these legal breaches, Performance's entire business has been damaged and/or destroyed.  Based on historical data and conservative estimates on a going forward basis, Performance will lose as much as $25,000 in revenue per month over the next three years, or $900,000.  Performances seeks damages of at least that amount or greater amounts to be proven at trial.

## COUNT FIVE

### Tortious Interference with Contracts and Business Expectancies

### (All Defendants)

99.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

100.    Performance had contracts with existing clients and business expectancies with those clients and prospective clients.

101.    Defendants were aware of these contracts and these expectancies because they involved in aspects of Performance's business and, in the case of Mr. Bassett and Mr. Russell, had been an employee and member, respectively, of Performance.

102.    Defendants knowingly and intentionally interfered with these contracts and expectancies by: (i) contacting Performance's clients, informing them that Sports & Fitness would be coaching them going forward, and diverting payments owed to Performance; (ii) engaging in marketing for baseball coaching services; (iii) participating in the drafting of notes memorializing their plan to steal Performance's business and destroy it as a going concern; (iv) wrongfully denying Performance access to the building so Performance could not engage in business operations; (v) destroying Performance's computer equipment such that it forever lost its customer lists and marketing materials; and (vi) through other wrongful acts described in detail above.

18

103.    Defendants' tortious interference was intended to cause, and did cause, the destruction of Performance's business as a going concern.

104.    As a result of these legal breaches, Performance's entire business has been damaged and/or destroyed.  Based on historical data and conservative estimates on a going forward basis, Performance will lose as much as $25,000 in revenue per month over the next three years, or $900,000.  Performance seeks damages of at least that amount or greater amounts to be proven at trial.

## COUNT SIX

### Conversion

### (Sports & Fitness; Marcus Moore; Briar Russell; and Adam Bassett)

105.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

106.    Performance owed the following property: (i) customer receivables; (ii) a laptop computer; (iii) customer lists and marketing material; and (iv) a baseball bat, a desk, and a file cabinet.

107.    Sports & Fitness (through its agents), Mr. Moore, Mr. Russell, and Mr. Bassett converted this property to their own use by: (i) contacting Performance's clients and diverting receivables owed to Performance to Sports & Fitness; (ii) wiping Performance's laptop hardrive, which destroyed the laptop; (iii) wiping Performance's computers, which destroyed its customer lists and marketing materials; and (iv) physically damaging or destroying the baseball bat, the desk, and the file cabinet.

108.    These wrongful acts of conversion damaged Performance in the amount of $100,000 (the majority of which pertains to the value of the customer list and marketing

materials, from which Performance would have derived profits) or greater amounts to be proven at trial.

## COUNT SEVEN

### Fraud and Fraudulent Inducement

### (Briar Russell)

109.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

110.    Mr. Russell knowingly made statements that were false when he made them, to-wit: he told Mr. Parkinson that Mr. and Mrs. Parkinson should relinquish their ownership interests in Sports & Fitness and Mace Real Estate, and he would relinquish his ownership interest in Performance, so he could focus only on the gym operations.  He further assured Mr. Parkinson that Performance would continue to engage in baseball coaching and Sports & Fitness would continue to engage only in gym operations.

111.    Based on the concerted conduct alleged above and the speed and efficiency in which it was carried out, Mr. Russell's statements were fraudulent and were intended to induce Mr. and Mrs. Parkinson to relinquish ownership interests in Mace Real Estate and Sports & Fitness so Defendants could steal Performance's business and destroy it as a going concern.

112.    Mr. and Mrs. Parkinson and, through them, Performance, reasonably relied on Mr. Russell's representations.  Otherwise, they would not have accepted the deal Mr. Russell proposed.  Stated another way, Mr. and Mrs. Parkinson would not have agreed to a deal if they knew Mr. Russell and other Defendants intended to compete directly with and destroy Performance.

113.    As a result of Mr. Russell's fraudulent inducement, the other Defendants were able to carry out their scheme to steal Performance's business and destroy it as a going concern.

114.    As a result of this fraud, Performance's entire business has been damaged and/or destroyed.    Based on historical data and conservative estimates on a going forward basis, Performance will lose as much as $25,000 in revenue per month over the next three years, or $900,000.  Performance seeks damages of at least that amount or greater amounts to be proven at trial.

## COUNT EIGHT

**Breach of Contract and the Covenant of Good Faith and Fair Dealing**

**(Sports & Fitness)**

115.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

116.    On May 17, 2023, Mr. and Mrs. Parkinson executed an Agreement of Redemption and Assignment of Membership Interest of Intent Sports & Fitness LLC.

117.    Paragraph 8 stated:

Each party agrees that, following this Agreement and Assignment, no party will make any public statement which materially disparages any of the other parties, their businesses, or the officers, employers, or agents of those businesses.

118.    Moreover, that agreement contained the implied covenant of good faith and fair dealing.

119.    Sports & Fitness breached Paragraph 8 by advertising baseball coaching services and camps and by holding out Mr. Bassett as "Director of Baseball," which are functions only Performance performed at the time the agreement was signed, and which disparaged Performance in its business by diverting business and/or by causing clients or prospective clients to reasonably—but incorrectly—believe that Sports & Fitness had assumed Performance's operations.

120.    Separately but relatedly, Sports & Fitness breached the implied covenant of good faith and fair dealing by using the agreement to facilitate its wrongful acquisition of Performance's trade secrets and proprietary information and to facilitate other wrongful acts committed by its agents and principals to steal Performance's business and destroy it as a going concern.

121.    As a result of these breaches, Performance's entire business has been damaged and/or destroyed.  Based on historical data and conservative estimates on a going forward basis, Performance will lose as much as $25,000 in revenue per month over the next three years, or $900,000.  Performance seeks damages of at least that amount or greater amounts to be proven at trial.

## COUNT NINE

### Civil Conspiracy

### (All Defendants)

122.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

123.    Defendants formed an illegal agreement, to wit: to steal Performance's business and destroy it as a going concern.

124.    Each of Defendants engaged in at least one overt act in furtherance of the conspiracy, to wit: (i) Mr. Bassett contacted Performance customers, misled them, and diverted receivables to Sports & Fitness; (ii) Mr. Bassett disseminated, and Sports & Fitness, Mr. Moore, and Mr. Russell received, Performance's trade secrets and proprietary information; (iii) Mr. Bassett's accessed Performance's computers without authorization and for an illegal purpose; (iv) Sports & Fitness' agents and employees destroyed Performance property; (v) Mr. Moore and Mr. Russell wrongfully denied Performance physical access to its property; (vi) Mr. Russell

fraudulently induced Mr. and Mrs. Parkinson and immediately began offering baseball coaching lessons in facilities used by Performance and in contravention of promises he made to Mr. and Mrs. Parkinson; (v) Sports & Fitness began immediately engaging in baseball coaching services once Mr. and Mrs. Parkinson had been induced into relinquishing their ownership interests; (vi) Ms. Sumrall transcribed handwritten notes detailing Sports & Fitness' plan to offer baseball coaching services that competed directly with Performance; and (vii) by engaging in other wrongful acts described above.

125.    The purpose of the conspiracy was obvious and the wrongful acts described above were carried out with such speed and efficiency that Defendants must have planned them for weeks, if not months.  Accordingly, each of Defendants should be held jointly and severally liable for any and all damage Performance suffered through any of the wrongful conduct alleged.

126.    As a result of this fraud, Performance's entire business has been damaged and/or destroyed.  Based on historical data and conservative estimates on a going forward basis, Performance will lose as much as $25,000 in revenue per month over the next three years, or $900,000.  Performance seeks damages of at least that amount or greater amounts to be proven at trial.

## COUNT TEN

### Unjust Enrichment / Accounting / Constructive Trust / Disgorgement

### (Sports & Fitness; Marcus Moore; and Briar Russell)

127.    Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

128.    Sports & Fitness, Mr. Moore, and Mr. Russell are in possession of property that in equity and good conscience belongs to Performance and they are using at least some of said property to generate profits that in equity and good conscience belongs to Performance.

129.   This property includes Performance's trade secrets and proprietary information, its customer lists and marketing materials (to the extent that material was retained by any of Defendants).

130.   Accordingly, this Court should order:

   a.   Sports & Fitness, Mr. Moore, and Mr. Russell pay an amount equivalent to the value of Performance's trade secrets, customer lists, and marketing materials, which is collectively worth at least $900,000;

   b.   Sports & Fitness, Mr. Moore, and Mr. Russell to provide an accounting, under oath, of all profits derived from said material and information they stole;

   c.   The imposition of a constructive trust over all profits generated by Sports & Fitness from June 1, 2023 and forward; and/or

   d.   Sports & Fitness, Mr. Moore, and Mr. Russell to disgorge all profits earned from said material and information from June 1, 2023 and forward.

## PRAYER FOR RELIEF

131.   Performance re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

132.   Performance prays for judgment against Defendants as follows:

   a.   For Count One:  Judgment against Adam Bassett in the amount of $900,000 or greater amounts to be proven at trial for stealing trade secrets integral to Performance's business;

   b.   For Count Two:  Judgment against Adam Bassett in the amount of $900,000 or greater amounts to be proven at trial for wrongfully accessing Performance's

computers without authorization and stealing trade secrets integral to Performance's business;

c.   For Count Three:  Judgment against Sports & Fitness, Marcus Moore, Briar Russell, and Katie Beth Sumrall, jointly and severally, in the amount of $900,000 or greater amounts to be proven at trial for aiding-and-abetting or conspiring to steal trade secrets integral to Performance's business;

d.   For Count Four:  Judgment against Sports & Fitness, Marcus Moore, Briar Russell, and Katie Beth Sumrall, jointly and severally, in the amount of $900,000 or greater amounts to be proven at trial for aiding-and-abetting or conspiring to wrongfully access Performance's computers to steal trade secrets integral to Performance's business;

e.   For Count Five:  Judgment against all Defendants, jointly and severally, in the amount of $900,000 or greater amounts to be proven at trial for tortiously interfering with Performance's contracts and business expectancies, which foreseeably caused and was intended to cause the destruction of Performance as a going concern;

f.   For Count Six:  Judgment against Sports & Fitness, Marcus Moore, Briar Russell, and Adam Basset for conversion of Performance's property, including its computers, customer lists and marketing materials, physical items owned by Performance, and Performance's accounts receivables, in the amount of $100,000 or greater amounts to be proven at trial;

g. For Count Seven:  Judgment against Briar Russell for fraud or fraudulent inducement, for which justifiable reliance caused the destruction of Performance's business, in the amount of $900,000 or greater amounts to be proven at trial;

h. For Count Eight:  Judgment against Sports & Fitness for breach of contract and the covenant of good faith and fair dealing, which proximately caused the destruction of Performance's business, in the amount of $900,000 or greater amounts to be proven at trial;

i. For Count Nine:  Judgment against all Defendants, jointly and severally, for their conspiratorial acts to commit any of the causes of action in Counts One through Eight, in the amount of $900,000 or greater amounts to be proven at trial;

j. For Count Ten:  Judgment against Sports & Fitness, Marcus Moore, and Briar Russell, jointly and severally, for the value of Performance property wrongfully obtained and any profits derived therefrom, including imposition of a constructive trust and an order disgorging them of ill-gotten profits;

k. For Counts One and Three, double damages of $900,000 as permitted by the Defend Trade Secrets Act;

l. Punitive damages in an amount to be determined by a jury in an amount no less than twice the compensatory award, or $1,800,000;

m. Attorneys' fees incident to an award of punitive damages and/or pursuant to the Defend Trade Secrets Act;

n. Pre- and post-judgment interest to the maximum extent permitted by law; and

o. Any other relief in law or equity to which Performance may be entitled.

## JURY DEMAND

133.    Performance demands a jury on all issues so triable.

* * * *

Dated:  June 6, 2023

Respectfully submitted,

**INTENT PERFORMANCE LLC**

/s/ *Chadwick M. Welch*
Chadwick M. Welch (MSB No. 105588)
HEIDELBERG PATTERSON WELCH WRIGHT
368 Highland Colony Parkway
Ridgeland, Mississippi 39157
Tel. 601.790.1588
Fax 601.707.3075
Email:  cwelch@hpwlawgroup.com

*Its Attorney*